**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| K.C., an individual,<br><br>                          Plaintiff,<br><br>          v.<br><br>**CHOICE HOTELS INTERNATIONAL, INC.;**<br>**WYNDHAM HOTEL & RESORTS, INC.;**<br>**SUPER 8 WORLDWIDE, INC.; AND**<br>**DAYS INNS WORLDWIDE, INC.**<br><br>                          Defendants. | Case No. 22-cv-2683<br><br>   Hon. Algenon L. Marbley<br>   Mag. Judge Deavers<br><br>**DEMAND FOR JURY TRIAL** |

**SECOND AMENDED COMPLAINT**

COMES NOW, Plaintiff K.C. ("Plaintiff" or "K.C."), by and through her undersigned counsel, and respectfully submits her Second Amended Complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Plaintiff K.C. is a survivor of human sex trafficking.

2.      K.C.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      K.C. met two people that groomed her into trafficking. Ultimately those people — her traffickers —came to control every aspect of her life. The defining factor of the relationship between K.C. and her traffickers, was that each night, K.C.'s traffickers forced her to have sex with men for money.

1

4. K.C. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice"); Wyndham Hotels & Resorts, Inc.; Days Inns Worldwide, Inc.; and Super 8 Worldwide. K.C.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

5. At Defendants' hotels, K.C. was forced to engage in sex with many men every day. Every new customer was another instance K.C. was forced to have sex against her will—that is to say, K.C. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6. K.C.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7. At some point, K.C. was able to escape the grasps of her traffickers and the prison of Defendants' hotel rooms.

8. K.C. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9. K.C. brings this lawsuit in an attempt to hold the Defendants that imprisoned her, accountable for their role in her trafficking

## OVERVIEW OF TRAFFICKING

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Choice, Wyndham Hotels & Resorts, Days Inns Worldwide, Inc., and Super 8 Worldwide. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12. Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags.

13. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

14. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[2] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15. Defendants and other hospitality industry members are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

---

[2] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

16.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to do the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

17.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of K.C. on their properties.

18.     K.C., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

**PARTIES**

19.     Plaintiff K.C. is a natural person and a resident and citizen of Ironton, Ohio.

20.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

      a.      Due to the sensitive and intimate nature of the issues, Plaintiff K.C. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[3]

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d

b.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[4] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[5] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[6]

c.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.   Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[7]

e.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the

---

1058, 1069 (9th Cir. 2000).

[4] Fed. R. Civ. P. 10(a).

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[6] Fed. R. Civ. P. 26(c).

[7] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

21.     **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Indianapolis and can be served through its registered agent, United States Corporation Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

22.     Choice owns, supervises, manages, controls, and/or operates the Comfort Inn located at 1213 E Dublin Granville Rd, Columbus, OH 43229 ("Columbus Comfort Inn").

    a.  The Columbus Comfort Inn by Choice is a Choice brand property.[8]

    b.  Choice employees work throughout the Columbus Comfort Inn by Choice. Choice employees work jobs including front desk and housekeeping.

    c.  Defendant Choice is the principal in an agency relationship with the Columbus Comfort Inn by Choice. It is both directly and vicariously liable for the acts and/or omissions of the staff at its branded hotels, including the Columbus Comfort Inn by Choice where K.C. was trafficked. The Columbus Comfort Inn by Choice also has apparent agency for Choice so as to establish vicarious liability, in addition to an actual agency relationship.

    d.  Choice controlled and dictated the actions and inactions of the Columbus Comfort Inn by Choice through highly specific and detailed brand standards, policies, and procedures.

---

[8] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

e. Choice knowingly benefited, or received something of value, from its ventures at the Columbus Comfort Inn by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where K.C. was trafficked, as well as in maintaining a positive public images for the Columbus Comfort Inn by Choice. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including K.C. and her trafficker.

f. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

g. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

23. **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

24. Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

7

25.     Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

26.     Wyndham Hotels provides franchise opportunities for its Days Inn branded hotels through **Defendant Days Inns Worldwide, Inc.** ("Days Inn"). It is a Delaware corporation with its principal place of business in Parsippany, NJ and it can be served through its registered agent, Corporation Service Company, at Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

27.     Wyndham Hotels provides franchise opportunities for its Super 8 branded hotels through **Defendant Super 8 Worldwide, Inc.** ("Super 8"). It is a North Dakota corporation with its principal place of business in Parsippany, NJ and it can be served through its registered agent, Corporation Service Company, at Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.[9]

28.     Wyndham owns, supervises, manages, controls, and/or operates the Days Inn located at 1212 E Dublin Granville Rd, Columbus, OH 43229 ("Columbus Days Inn") and the Super 8 located at 1078 E Dublin Granville Rd, Columbus, OH 43229 ("Columbus Super 8") Wyndham owned, supervised, managed, controlled, and/or operated the Knights Inn located at 1300 E Dublin Granville Rd, Columbus, OH 43229 ("Columbus Knights Inn") (collectively, all three properties are the "Wyndham Branded Columbus Properties").

---

[9] Defendants Wyndham Hotels & Resorts, Inc., Super 8 Worldwide, Inc., and Days Inns Worldwide, Inc. are referred to herein as "Wyndham." Under these circumstances, these entities are one and the same for purposes of this lawsuit. Any reference to Wyndham, Inc., Super 8 Worldwide, Inc., and Days Inn Worldwide, Inc. is a reference to all the entities.

a. The Columbus Days Inn and Columbus Super 8 are Wyndham branded properties.[10]

b. The Columbus Knights Inn was a Wyndham branded property until Wyndham sold the Knights Inn brand in April 2018.[11]

c. Wyndham employees worked throughout the Wyndham Branded Columbus Properties. Wyndham employees worked jobs including front desk and housekeeping. Wyndham is the principal with control over nearly every element of operations at the Wyndham Branded Columbus Properties. Wyndham is liable, either directly, vicariously, or indirectly through an agency relationship for acts and/or omissions of the employees at its branded hotels, including the Wyndham Branded Columbus Properties where K.C. was trafficked. Wyndham has an actual and apparent agency relationship with the physical property owners of the Wyndham Branded Columbus Properties as to establish vicarious liability.

d. Wyndham controlled and dictated the actions and inactions of the Wyndham Branded Columbus Properties through highly specific and detailed brand standards, policies, and procedures.

e. Wyndham knowingly benefited, or received something of value, from its ventures at the Wyndham Branded Columbus Properties through royalty payments, licensing fees, and percentages of the gross room revenue

---

[10] *Our Brands,* Wyndham Hotels, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited September 27, 2022).

[11] David Eisen, *Wyndham sells Knights Inn brand to Red Lion ahead of spin-off*, HOTEL MANAGEMENT (April 4, 2018), https://www.hotelmanagement.net/transactions/wyndham-sells-knights-inn-brand-to-red-lion-ahead-spin-off

generated by the hotel operations, including rates charged through rooms where K.C. was trafficked, as well as in maintaining a positive public image for the Wyndham Branded Columbus Properties. Wyndham also benefited from gathering personal data from the Wi-Fi it provided to customers including K.C. and her trafficker.

f. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio including the Wyndham Branded Columbus Properties, contracting to supply services in Ohio. Wyndham has derived substantial revenue from services rendered in Ohio.

g. Whenever reference is made in this Complaint to any act, deed, or conduct of Wyndham, the allegation is that Wyndham engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Wyndham.

## JURISDICTION AND VENUE

29. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

31.     Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, 2:2022-cv-02683; 2:2022-cv-02690; 2:2022-cv-02734 2:2022-cv-03185; 2:2022-cv-03202; and 2:2022-cv-03203 currently pending before Chief Judge Algenon L. Marbley.

<u>**FACTUAL BACKGROUND**</u>

INTRODUCTION

32.     K.C. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

33.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

34.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[12] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

35.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human

---

[12] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

36.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

37.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like K.C. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

38.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

39.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF K.C.

40.     K.C. met her traffickers when she was twenty-six (26) years old.

41.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, K.C. was held captive and sold for sex by her traffickers.

42.     During the time that she was trafficked, K.C.'s traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with K.C.

43. Throughout her trafficking, K.C.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Craigslist, advertising for K.C.'s availability for commercial sex at Defendant's locations.

44. K.C. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

45. For approximately eight grueling years, while under the coercive control of her traffickers, K.C. was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, K.C. was trafficked in the following hotels:

   a. Days Inn by Wyndham at 1212 E Dublin Granville Rd, Columbus, OH 43229;

   b. Super 8 by Wyndham at 1078 E Dublin Granville Rd, Columbus, OH 43229;

   c. Knights Inn by Wyndham at 1300 E Dublin Granville Rd, Columbus, OH 43229; and

   d. Comfort Inn by Choice at 1213 E Dublin Granville Rd, Columbus, OH 43229.

46. During the time she was trafficked, K.C.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

47. While at the Defendants' hotels, K.C.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

48. During her captivity at Defendants' hotels, K.C. was raped, continuously abused physically and verbally, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

49. At the above listed hotels, K.C. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of K.C.'s deterioration brought on by the abuse

perpetrated by her traffickers, including bruising and physical and verbal abuse occurring loudly in areas of Defendants' properties.

50.    Every time K.C. interacted with Defendants' staff, it was readily apparent that K.C. was under the control of her traffickers. K.C.'s traffickers.

51.    The traffickers of K.C. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of K.C.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF K.C. AT THE COMFORT INN BY CHOICE**

52.    Plaintiff K.C. was subjected to sex trafficking at the Columbus Comfort Inn by Choice located at 1213 E Dublin Granville Rd, Columbus, OH 43229.

53.    Plaintiff and her traffickers stayed at the Columbus Comfort Inn by Choice from 2012 to 2020, rotating, frequently staying for days at a time, encountering the same staff, within this eight-year period.

54.    The Comfort Inn front desk staff would laugh and ridicule K.C. making statements to K.C. that she was a "slave" to her traffickers and good for nothing else.

55.    K.C. recalls distinctly being ridiculed by a tall, younger, African American man as he watched her traffickers force her to continuously show up at this location for the sole purpose of being forced into sexual exploitation.

56.    There would be public fighting with the johns and K.C.'s traffickers, loud music, drug deals after dawn, and even broken windows and doors from fighting at the Columbus Comfort Inn by Choice, yet the Columbus Comfort Inn by Choice continuously allowed K.C. and her traffickers to return for eight years.

57.    Further, with each stay at the Columbus Comfort Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for

extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for K.C. or her traffickers at the front desk; Unusually large number of male visitors going in and out of K.C.'s room; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

58. Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Columbus Comfort Inn by Choice.

59. These red flags were open and obvious to anyone working at the Columbus Comfort Inn by Choice and lasted continuously for eight years.

**THE SEX TRAFFICKING OF K.C. AT THE DAYS INN BY WYNDHAM**

60. Plaintiff K.C. was subjected to sex trafficking at the Columbus Days Inn by Wyndham located at 1212 E Dublin Granville Rd, Columbus, OH 43229,

61. Plaintiff and her traffickers stayed at the Columbus Days Inn by Wyndham from 2012 to 2020, rotating, frequently staying for days at a time, encountering the same staff, within this eight-year period.

62. Plaintiff's traffickers were constantly fighting with K.C. One day, Plaintiff's traffickers violently beat her, that she ran to the front desk asking for police help to which the front desk denied her aid. K.C. was able to obtain a phone from a guest to call the police, but when the police arrived on site, the trafficker stated if K.C. were to say anything about the trafficking, he would kill her and her family. K.C. thus indicated to the police she was fine, and it was not her that called the police.

63. Further, with each stay at the Columbus Days Inn by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for

15

extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for K.C. or her traffickers at the front desk; Unusually large number of male visitors going in and out of K.C.'s room; Physical abuse in public spaces; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

64. Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Columbus Days Inn by Wyndham.

65. These red flags were open and obvious to anyone working at the Columbus Days Inn by Wyndham and lasted continuously for eight years.

**THE SEX TRAFFICKING OF K.C. AT THE SUPER 8 BY WYNDHAM**

66. Plaintiff K.C. was subjected to sex trafficking at the Columbus Super 8 by Wyndham located at 1078 E Dublin Granville Rd, Columbus, OH 43229.

67. Plaintiff and her traffickers stayed at the Columbus Super 8 by Wyndham from 2012 to 2020, rotating, frequently staying for days at a time, encountering the same staff, within this eight-year period.

68. Plaintiff's traffickers would pay the Columbus Super 8 by Wyndham staff to keep quiet and to allow "johns" to come to the hotel and have parties.

69. There would be constant fighting and yelling between the traffickers, johns, and K.C. coming from the room at the Columbus Super 8 by Wyndham. Police were called to this location numerous times because of the noise complaints and still nothing was done by Defendant to stop the traffickers. As long as the staff was paid by K.C.'s traffickers, they did not care what was occurring, no matter how many times they witnessed K.C. physically deteriorated.

70. Further, with each stay at the Columbus Super 8 by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for K.C. or her traffickers at the front desk; Unusually large number of male visitors going in and out of K.C.'s room; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

71. Plaintiff was repeated raped and otherwise sexually abused thousands and thousands of times at the Columbus Super 8 by Wyndham.

72. These red flags were open and obvious to anyone working at the Columbus Super 8 by Wyndham and lasted continuously for eight years.

### THE SEX TRAFFICKING OF K.C. AT THE KNIGHTS INN BY WYNDHAM

73. Plaintiff K.C. was subjected to sex trafficking at the Columbus Knights Inn by Wyndham located at 1300 E Dublin Granville Rd, Columbus, OH 43229.

74. Plaintiff and her traffickers stayed at the Columbus Knights Inn by Wyndham from 2012 to 2018, rotating, frequently staying for days at a time, encountering the same staff, within this eight-year period. Wyndham owned this property until April 2018.

75. At the Columbus Knights Inn by Wyndham location, the rooms were located outside with cameras in the parking lot pointing towards the walkway to the rooms. There was constant partying, foot traffic, yelling, music, and a lot of drug deals occurring at this location. Accordingly, the front desk employees had access to the cameras. The traffic and parade of men coming in and out of the Knights Inn by Wyndham was obvious and noticeable.

17

76.     Further, with each stay at the Columbus Knights Inn by Wyndham, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large numbers of used condoms left in the trash; Unusually large number of male visitors asking for K.C. or her traffickers at the front desk; Unusually large number of male visitors going in and out of K.C.'s room; Visible signs of prior/private physical abuse; Asking the front desk not to be disturbed; and Loud noises of abuse or other violence audible to staff and/or other rooms.

77.     Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Columbus Knights Inn by Wyndham.

78.     These red flags were open and obvious to anyone working at the Columbus Knights Inn by Wyndham and lasted continuously for the six years Wyndham owned the location.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

79.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[13] The United Nations,[14] international non-profits,[15] and the U.S. Department of Homeland Security,[16] have documented this well-known

---

[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[14] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[15] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[16] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

80.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

81.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[17] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[18] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

---

[17] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[18] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

82. The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

83. The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

84. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

85. A brief examination of just a handful of examples for each Hotel Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

a. Regarding a stay at the Columbus Comfort Inn by Choice on 1213 E Dublin Granville Rd, Columbus, OH 43229, a hotel customer wrote a review saying, "The worst hotel in America I wouldn't have even given them the one star but you have to put something. Staff very rude and unprofessional they are nasty don't change the sheets or do a good job cleaning your room oh yeah and they stole from me and my roommates while our company stayed there for almost a month. Nothing but drug dealers and prostitution

20

going on all day and night this place deserves to be shutdown immediately. Oh here's a picture of one of the crackheads laying on the stairs in the hallway 21ocaine is a hell of a drug. They deserve 5 thumbs down they ruined this company's name."

b. Regarding another stay at the Columbus Comfort Inn by Choice on 1213 E Dublin Granville Rd, Columbus, OH 43229, a hotel customer wrote a review saying, "Very poor customer service, maids service lousy and hotel nasty, drug infested, loitering, prostitutes. Maids wouldn't clean the rooms. I took dirty stained linen off my bed and they put it back on two days straight. Had to go get new sheets and put on my bed and the maids never put any other cover on my bed for the duration of my stay. The manager was never around too follow up on complaints. If ever visiting Columbus, Ohio do not stat at this hotel it is not safe!!!"

**WYNDHAM**

b. Regarding a stay in November 2010 at the Columbus Days Inn by Wyndham located at 1212 E Dublin Granville Rd, Columbus, OH, 43229, a hotel customer wrote a review saying, "PROSTITUTE? So this is by far the worst hotel EVER! First i had to walk to the front clerk while looking at a discusting hole in the wall. poorest quality their is mold on the walls, holes, scraping paint and wallpaper. after getting my room number, and started walking to my with my two kidsand wife, note that my kids were both 6 at the time. with a suprise at the door, there was a prostitute. a prostitute who called herself dillie? saying she was waiting for her man she called hustler? i

21

was horrified having the thought of my children having to look at a half naked prostitute infront of me. i felt like a falure father. the prostitute wouldent stop fighting for the room eventhough it was ours, until we had to call the police to get her out....HORRIBLE PLACE TO STAY NEVER AGAIN DAMMIT. by the way there wer maggets and ants in my room. Lets just say that if I had to stay at this "hotel" or die................I would rather die."

c.  Regarding another stay in May 2014 at the Columbus Days Inn by Wyndham, a hotel customer wrote a review saying, "This place is super shady.  We checked in and then checked out about 15 minutes later.  From the parking lot you could see where some of the windows were broken out on the second floor.  One room on the base floor had all the furniture pushed to the center of the room and the mattress warped in plastic (use your imagination)…this was no place to spend the night."

d.  Regarding a stay in October 2013 at the Columbus Super 8 by Wyndham located at 1078 E Dublin Granville Rd, Columbus, OH 43229, a hotel customer wrote a review saying, "The reception staff was rude, I saw a couple guys jump in over the wall into hotel complex. Horrible hotel was rated 2.5 stars but was not worth even half a star. There was smoke smell in the room, in the corridor everywhere, there were pimps and prostitutes and drug peddlers all over the hotel, me and wife somehow spent one night and moved out next morning asap. Nobody should stay here even for a moment, I think this place should be forced to close down."

22

e. Regarding another stay in October 2018 at the Columbus Super 8 by Wyndham, a hotel customer wrote a review saying, "I've probably stayed in worse but I can't remember when. Scary, scary, scary!! Drug dealers and prostitution rampant all night long. Kept imagining what the room would look like with a black light. Broken lock on the door. Filthy room. I actually spread the towels out on the bed and slept on top of them as I wasn't sure what I would catch from the bed linens. Would not have stayed if there were any other rooms available within 15miles and i called them all."

a. In 2015, a judge ordered the Columbus Super 8 by Wyndham to shut down for drugs and prostitution.

b. Regarding a stay in 2015 at the Columbus Knights Inn by Wyndham located at 1300 E Dublin Granville Rd, Columbus, OH 43229, a hotel customer wrote a review saying, "This place is disgusting, I stepped in and tired old me opened the sheets and then all the sudden I saw bugs, I googled them to see what they were and it was bed bugs, as I was going to complain a woman/man approached me and asked "If I was the guy that ordered her off backpage" that's when I was done, prostitutes, bugs, disgusting and then on top of that there's young kids all over there drinking and having "Hotel parties" worse hotel in Columbus and needs shut down."

c. The Columbus Dispatch indicated a judge had ordered the Columbus Knights Inn by Wyndham, to be shut down November 2014 as it had been a haven for drug dealers and prostitutes. Police had been called there 785 times from January 2012 to November 2014.

23

## DEFENDANTS FACILITATED THE TRAFFICKING OF K.C.

86. Each Defendant is a signatory of the Code[19] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

87. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

88. Defendant Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

89. Defendants profited from the sex trafficking of Plaintiff K.C. Defendants rented rooms to and provided Wi-Fi to K.C.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where K.C. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of K.C.'s trafficking.

90. Defendants benefited from the steady stream of income that K.C.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that K.C.'s traffickers and customers rented where K.C. was harbored and maintained for the purpose of sex

---

[19] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

trafficking. In addition, Defendants profited from data collected each and every time K.C.'s trafficking and customers used Defendants' Wi-Fi to advertise and solicit K.C. for commercial sex.

91. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where K.C. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

92. Moreover, Defendants repeatedly collected data on K.C., her traffickers, and "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of K.C.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking from occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from K.C. and other victims like her being trafficked at their locations.

93. Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where K.C. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-

25

risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

94. Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where K.C. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

95. In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, information technology and internet systems. These systems, which Defendants required its branded properties to use, were defective in ensuring customer safety and, specifically, identifying and mitigating suspected and actual incidents of human trafficking on Defendants' properties.

96. A reasonably diligent hotel brand in the Defendants' position would have included policies and procedures to identify and mitigate guest safety issues related to human trafficking in its franchise agreements, brand standards, and systems standards. Upon information and belief, Defendants' branded properties would have expected this material to be included in Defendants' policies and procedures. By failing to include such policies and procedures, Defendants led the branded properties to be negligently managed.

97. Instead, Defendants negligently required the branded properties to adopt injurious procedures that allowed trafficking to continue and thrive at Defendants' properties, such as failing to accurately identify customer complaints that raise red flags of trafficking and take meaningful steps to address them. Defendants provided and operated defective systems for daily property

26

operations, management, policies, procedures, and training that were incapable of determining whether they were generating revenue as a result of renting rooms where victims of trafficking were harbored and sold for commercial sex.

98.      Defendants voluntarily undertook and assumed a duty to protect the safety of guests at the branded property where Plaintiff was trafficked, such as security, criminal activity, food safety, emergency response protocols, and fire equipment, among others.

99.      Defendants did not exercise reasonable due diligence and care in selecting franchisees to operate its branded properties. Defendants failed to conduct background checks and additional investigations to identify customer safety and security risks. Defendants failed to conduct investigations such as background checks background and additional due diligence to identify whether they sold and licensed their systems and brands to a company able to secure customer safety and security risks.

100.     Defendants negligently designed the layout and structure of the franchised unit or approved the layout and design of the interior or exterior of the hotel property so that red flags of human trafficking were hidden.

101.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

  a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

  b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated

27

sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

102.  As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, K.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS**

103.  In the hotel industry, Defendants are major hotel corporations that hold, own, manage, and operate trademarks, licenses, and standard operating systems for hotel brands. As parent companies with decades of expertise in the hotel industry, Defendants provide property

owners with standard operating systems that control the daily operations and management of Defendants' branded properties.

104. Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

105. Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

106. Defendants provide their branded properties brand name recognition, marketing, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Defendants.[20] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[21]

107. Defendants require their branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, processing credit card transactions, internet and technology, and guest

---

[20] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[21] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

safety.

108. Essentially, Defendants provide a hotel in a box. Branded property owners only provide the physical property, while Defendants provide everything else required to operate and manage the hotel down to the minute details of daily operation. Branded properties must follow Defendants' strict standards to receive the right to operate one of Defendants' brands.

109. Per the relevant franchise agreements,[22] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations to monitor compliance. If Defendants' branded properties fail to comply with Defendants' standards, Defendants penalize properties with fees and the ultimate threat of termination of the franchise agreement.

## CHOICE

110. Choice exercises day-to-day control over the Columbus Comfort Inn by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Columbus Comfort Inn by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

111. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Choice's property management system;

    b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's

---

[22] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

centralized systems;

c.  Requiring branded locations to keep audit reports and other records;

d.  Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e.  Providing marketing requirements and standardized marketing services for the branded locations;

f.  Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h.  Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i.  Providing training and orientation materials for branded property staff;

j.  Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k.  Regulating the rates for room rentals; and

l.  Insurance coverage requirements.[23]

112.  Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by

---

[23] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

31

Choice.[24]

113.    Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[25]

114.    Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[26]

115.    Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[27]

116.    Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Columbus Comfort Inn by Choice.[28]

117.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[29]

118.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

119.    Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and

---

[24] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

[25] *Id.*

[26] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about

[27]  *Supra* n 101

[28] *Id.*

[29] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

exorbitant requirements.[30]

120. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.[31]

**WYNDHAM**

121. Wyndham exercises day-to-day control over the Wyndham Branded Columbus Properties and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over the Wyndham Branded Columbus Properties where K.C. was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

122. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use Wyndham's property management system;

    b. Requiring branded locations to keep audit reports and other records;

    c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

    d. Gathering reports of data generated by branded locations including

---

[30] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[31] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements.[32]

123.    Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end

---

[32] *See e.g.* 2014 Franchise Disclosure Document https://fddexchange.com/wp-content/uploads/2014/03/Days-Inn-Franchise-Disclosure-Document-FDD-July-12-2012.pdf

management by Wyndham.[33]

124.    Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels.[34]

125.    Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Wyndham Branded Columbus Properties where K.C. was trafficked.[35]

126.    Wyndham mandates branded properties source through Wyndham's global distribution system.[36] Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Wyndham Branded Columbus Properties where K.C. was trafficked.[37]

127.    Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.[38]

128.    Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.[39] Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food

---

[33] *Our Brands*, WYNDHAM HOTELS, https://www.wyndhamhotels.com/wyndham-rewards/our-brands (last visited Jun. 15 2022).

[34] *Benefits of Partnering with Wyndham Hotels & Resorts,* WYNDHAM HOTELS, CHOICE, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 15, 2022).

[35] *Id.*

[36] *Benefits of Partnering with Wyndham,* WYNDHAM, https://development.wyndhamhotels.com/the-wyndham-advantage/ (last visited Jun. 20, 2022).

[37] *See e.g., id* ("[Our goal is to ensure the design and construction of your hotel is as seamless as possible, guided by the appropriate brand standards.")

[38] Id.

[39] *Wyndham Implements Oracle Hospitality OPERA Cloud Property Management in its Full-Service Hotels,* HOTEL TECHNOLOGY NEWS (May 18, 2021), https://hoteltechnologynews.com/2021/05/wyndham-implements-oracle-hospitality-opera-cloud-property-management-in-its-full-service-hotels/

and beverage.[40]

129.    Wyndham sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Wyndham Branded Columbus Properties where K.C. was trafficked.[41]

130.    Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.[42] Wyndham is also responsible for setting the core values and culture for all Wyndham employees.[43] In addition, Wyndham sets forth policies for, and provides employee benefits.[44]

131.    Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.[45]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

---

[40] *Supra* n 103

[41] *Leveraging technology to deliver an exceptional guest experience,* WYNDHAM (Summer 2021) 4, https://developmentsupport.wyndham.com/files/8516/2869/4484/Tech-Guide-Q3-2021.pdf

[42] *Join the Wyndham Family,* WYNDHAM, https://careers.wyndhamhotels.com/ (last visited Jun. 22, 2022)

[43] *About Wyndham,* WYNDHAM, https://careers.wyndhamhotels.com/content/About-Wyndham/#culture (last visited Jun 22, 2022)

[44] *Our Benefits,* WYNDHAM, https://careers.wyndhamhotels.com/content/Our-Benefits/?locale=en_US (last visited Jun 22, 2022)

[45] *Human Rights Statement*, http://q4live.s22.clientfiles.s3-website-us-east-1.amazonaws.com/153757806/files/doc_downloads/governance_documents/Wyndham-Hotel-Resorts-Human-Rights-Policy-Statement.pdf (last visited Jun. 15, 2022).

132.    Plaintiff incorporates each foregoing allegation.

133.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

134.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

135.    Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known the trafficking was occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for"' and proximate cause of Plaintiff's injuries and damages.

136.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action,

37

including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: January 13, 2023

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com

38